```
            _____

            No. 95-2940
            _____


United States of America,          *
                                   *
        Appellee,                  *
                                   *
    v.                             *
                                   *
Martha Elena Gonzales, also        *
known as Marta Gonzales,           *
                                   *
        Appellant.                 *


            _____
                                        Appeals from the United States
            No. 95-3261                 District Court for the
            _____                 District of Minnesota.


United States of America,          *
                                   *
        Appellee,                  *
                                   *
    v.                             *
                                   *
Jose Ramiro Valenzuela-Obeso,      *
also known as Tony, also known     *
as Ramiro Valenzuela,              *
                                   *
        Appellant.                 *


            _____

            No. 95-3263
            _____


United States of America,          *
                                   *
        Appellee,                  *
                                   *
    v.                             *
                                   *
Juan Manuel Valenzuela-Obeso,      *
also known as Kiki, also known     *
```

as Miti,                              *
                                      *
        Appellant.                    *


        _____

        No. 95-3370
        _____


United States of America,             *
                                      *
        Appellee,                     *
                                      *
    v.                                *
                                      *
Patricia Camerina Lopez,              *
                                      *
        Appellant.                    *


                        _____

                Submitted:     May 17, 1996

                    Filed:   July 26, 1996
                        _____

Before MAGILL, ROSS, and MURPHY, Circuit Judges.
                        _____


MAGILL, Circuit Judge.


        Defendants in this case were convicted of various counts of
conspiracy to distribute illegal drugs, see 21 U.S.C. § 846; possession,
and aiding and abetting possession, of illegal drugs with intent to
distribute, see 21 U.S.C. § 841(a)(1); and money laundering and conspiracy
to launder money, see 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i).  On
appeal, they contend that the government violated Brady v. Maryland, 373
U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500, by failing to turn
over to the defense certain evidence.  The defendants further challenge a
host

of evidentiary and other trial rulings made by the district court.[1]  We affirm.

## I.  BACKGROUND

For several years, officers of the Minnesota Bureau of Criminal Apprehension (BCA) suspected that Juan and Jose Valenzuela-Obeso (Juan and Jose, respectively) supervised a large drug importation and distribution organization in Minnesota.  During the long investigation, the police arrested a number of individuals who were involved in the distribution of heroin for the organization.  Several of those arrested cooperated with the police by providing information that furthered the investigation.

The investigation culminated on March 2, 1994, when the police executed a number of search warrants.  During these searches, officers seized one pound of 95% pure methamphetamine, 58 pounds of marijuana, 27.8 grams of cocaine, notebooks containing writings that were consistent with drug notes, and $5000 cash.  The officers also discovered several Western Union cash register receipts, leading the officers to suspect Juan and Jose and their common-law wives, Patricia Lopez and Martha Gonzales, of money laundering.

The police also searched a Ford Bronco located in the driveway of one of the residences.  Prior to the search, the officers had a narcotics dog sniff the vehicle, and the dog showed interest in the rear door area.  Police removed the rear door panel, but found only tools, and not drugs, within the panel.

Based on the evidence uncovered during the long investigation, the defendants were charged with several drug trafficking and money laundering violations.  Jose and Juan were charged with conspiracy

------

[1]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

to distribute and possession with intent to distribute heroin, cocaine, marijuana, and methamphetamine, from January 1, 1990 to March 2, 1994 (Count I). Jose was further indicted on charges of possession with intent to distribute 365 grams of methamphetamine on March 2, 1994 (Count II), and use of a juvenile in connection with a drug trafficking offense (Count VII). Juan was further indicted on charges of aiding and abetting possession with intent to distribute 58.6 pounds of marijuana (Count III) and 27.8 grams of cocaine on March 2, 1994 (Count IV), and use of a juvenile in connection with a drug trafficking offense (Count VI). Finally, Juan, Lopez, and Gonzales were indicted on charges of conspiracy to launder money (Count VIII), and Jose was indicted on charges of money laundering (Count VIII).

At trial, the government put on overwhelming evidence of the defendants' guilt. First, the government introduced at trial the physical evidence seized during the March 2, 1994 searches. Further, four mid-level heroin dealers testified that they bought their heroin from Jose and Juan. Each described in detail how the transactions took place. Two other witnesses testified that they were "runners" in the Obeso organization, delivering heroin for Jose and Juan. One of the runners, Rolando Penalver-Tamarit, participated with police in a controlled delivery of cash back to Jose. Finally, Eldon Fontana, a twenty-four-year veteran with the Hennepin County Sheriff's Department, testified that the notebooks seized contained notations that, in several important respects, were fully consistent with drug notes; i.e., those notations made by drug dealers while tallying the amount of drugs bought and sold and money taken in.

The government also introduced considerable evidence demonstrating that the defendants had committed money laundering violations. During trial, a number of Western Union money transfer applications (MTAs) were introduced, showing that between February 1991 and March 1994, approximately $497,484 was wired via Western

Union. The money transfers were sent in various names, including Martha Gonzales, Patricia Lopez, Juan Valenzuela, and Jose Valenzuela. The money was primarily sent to California, although several transfers went to Mexico and Arizona.

The government provided testimony linking the MTAs to the defendants. Cynthia Pose, an employee at a drug store from where several of the money transfers originated, identified Gonzales as someone who had sent money via Western Union. She further testified that Gonzales had provided different names and addresses when she sent money. Further, Debra Springer, a handwriting expert who analyzed the writing on the MTAs, testified as to how many documents were produced by each defendant. As to Lopez, she noted that four documents were conclusively produced by her; that as to nineteen others, there were some indications that Lopez had produced them; and that for thirteen others, Lopez at least filled out the information section of the transfer form. She further testified that Gonzales definitely produced three documents, that it was highly probable that she produced twelve others, and that it was probable that she produced nineteen others. Springer determined conclusively that at least one document was produced by Jose.

Special Agent Paul Wheeler of the Internal Revenue Service, a money laundering expert, testified that the transactions at issue fit several money laundering patterns and that several factors, such as the amount of money sent per transaction, the use of certain false information on the send forms, and the use of several different Western Union locations, were all consistent with money laundering. Wheeler further testified that he reviewed the tax returns of the defendants and concluded that the sums transferred far exceeded the lawful incomes of the defendants.

During the trial, the government failed to turn over, or delayed in turning over, certain evidence to the defense. The

first such piece of evidence was a prior statement made by one of the prosecution's witnesses, Greg Bauer. Bauer had been an informant with the police beginning in 1991. During trial, defense counsel requested that any prior statements made by Bauer concerning the defendants be turned over to the defense pursuant to the Jencks Act. The government assured counsel that Bauer had made no prior statements implicating the defendants. However, before Bauer was cross-examined, the government learned that in 1992, Bauer had in fact made oral statements indicating that the defendants had been engaged in illegal activity as far back as 1990. The government did not turn this evidence over to the defense counsel, who subsequently tried to impeach Bauer concerning his apparent recent fabrication regarding the defendants. When Bauer told counsel that he had in fact previously implicated the defendants, thus bolstering his testimony, counsel for Juan and counsel for Lopez moved for a mistrial. The court denied this motion when the defendants refused to waive their double jeopardy rights.

The government also delayed turning over reports that case agent Mike Zasada had compiled regarding the informants in the case. Many of these reports detailed the legal problems of several of the informants. The material was not turned over to the defense until April 10, 1995, after several of the informants had already testified.

The third piece of evidence that defendants claim should have been turned over concerned the search of the Bronco. At the time of the search, the officers believed that the rear door panel could have been an after-market change in the vehicle, added to facilitate drug smuggling. Because the officers were unable to substantiate this belief, however, the government presented no evidence concerning this theory. The evidence presented to the jury related only to the fact that the rear panel contained a space large enough to transport drugs. During a break in trial, the

government did learn that the rear door panel was not an after-market change. The government did not relay this knowledge to the defense, although defense counsel gained this information from an independent source during trial. Counsel moved for a mistrial, which was denied.

After hearing the evidence, the jury returned a verdict of guilty on all counts except Count VII, which charged Jose with the use of a juvenile in connection with a drug trafficking crime. The court further entered a judgment of acquittal on Count VI, which charged Juan with the use of a juvenile in connection with a drug trafficking crime. As a result of the convictions, Juan received a sentence of 292 months imprisonment, 10 years of supervised release, and a $200 special assessment; Jose received a sentence of 292 months imprisonment, 5 years of supervised release, and a $150 special assessment; and Lopez and Gonzales each received a sentence of 30 months imprisonment, 3 years of supervised release, and a $50 special assessment.

Defendants raise several issues on appeal. Juan, Jose, and Lopez contend that the district court erred in not granting a mistrial based on the government's failure to turn over certain evidence. Juan further contends that the district court erred in calculating the amount of heroin attributable to him for sentencing and that the court erred in admitting the testimony of the informants because the informants were not made available to defense counsel prior to trial. Lopez and Gonzales contend that there was insufficient evidence to convict them of conspiracy to launder money; that the court erred in admitting the testimony of the handwriting expert; that the Western Union documents should have been inadmissible at trial as hearsay; and that the court erred in instructing the jury on willful blindness and in failing to charge the jury according to their theory of defense.

## II.  BRADY AND JENCKS ACT VIOLATIONS

Juan, Jose, and Lopez contend that the government violated Brady and the Jencks Act by failing to turn over certain evidence covered by these provisions.  Because of this violation, they contend, the district court should have granted their motion for a mistrial or a new trial.  We disagree.

### A.  Brady

Under Brady, supra, the government is required to disclose any evidence that is both "favorable to an accused" and is "material either to guilt or to punishment."  Brady, 373 U.S. at 87.  In most circumstances, evidence favorable to the accused is material only "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  Kyles v. Whitley, 115 S. Ct. 1555, 1565 (1995) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)).[2]  The defendant must demonstrate that he was denied a fair trial, by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Id. at 1566.

Brady applies whether or not the accused has specifically requested the covered information, see Kyles, 115 S. Ct. at 1565 (citing Bagley, 473 U.S. at 682), and it applies to both exculpatory evidence and impeachment evidence, see Bagley, 473 U.S. at 676.  In analyzing a Brady claim, we do not consider the

---

[2]Where the prosecution knowingly uses perjured testimony, a standard of materiality more favorable to the accused applies. In such a situation, the conviction must be set aside if "there is any reasonable likelihood" that the false testimony affected the verdict.  See Kyles, 115 S. Ct. at 1565 n.7 (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)).  In this case, there is no assertion that the prosecution knowingly used perjured testimony, and so the "reasonable probability" standard applies.

suppressed evidence item-by-item, but rather we must determine whether the suppressed evidence, viewed collectively, undermines confidence in the verdict.  See Kyles, 115 S. Ct. at 1567.

There are several limitations to Brady.  First, Brady does not require the government to disclose inculpatory evidence.  See United States v. Roach, 28 F.3d 729, 734 (8th Cir. 1994) (requested information must be exculpatory); United States v. Carper, 942 F.2d 1298, 1300 n.1 (8th Cir.), cert. denied, 502 U.S. 993 (1991).  Second, in this Circuit, the rule of Brady is limited only to the discovery, after trial, of information which had been known to the prosecution but unknown to the defense.  See United States v. Manthei, 979 F.2d 124, 127 (8th Cir. 1992) (quoting Nassar v. Sissel, 792 F.2d 119, 121 (8th Cir. 1986)).  Where the prosecution delays disclosure of evidence, but the evidence is nonetheless disclosed during trial, Brady is not violated.  See United States v. Boykin, 986 F.2d 270, 276 n.6 (8th Cir.) (quoting Nassar, 792 F.2d at 121), cert. denied, 114 S. Ct. 241 (1993).  Finally, the government need not disclose evidence available to the defense from other sources or evidence already possessed by the defendants.  See United States v. Jones, 34 F.3d 596, 600 (8th Cir. 1994), cert. denied, 115 S. Ct. 1701 (1995).

Juan, Jose, and Lopez first argue that the government violated Brady by not disclosing that Bauer had previously implicated them in the heroin distribution scheme.  Because they did not know this, defendants contend, they walked into a trap on cross-examination as they tried to impeach Bauer's current testimony as a recent fabrication.

This argument misapplies Brady's two-part test.  Under Brady, before we look at the effect at trial of the nondisclosure, we determine the nature of the evidence itself: is the evidence inculpatory or exculpatory? If the evidence is inculpatory, then Brady is not violated, regardless of the effect at trial of the

nondisclosure. See Roach, 28 F.3d at 734. In this case, the Bauer statement is clearly inculpatory. The statement does not demonstrate that appellants are innocent of the crime for which they have been accused. Rather, the statement is at the other end of the spectrum: it shows that appellants have been involved in drug trafficking as far back as 1990, corroborating the testimony of the other witnesses in this case. Thus, nondisclosure of this evidence does not violate Brady.[3]

Juan, Jose, and Lopez also contend that the delayed disclosure of both the Zasada files and the results of the inquiry regarding the Bronco violates Brady, thereby justifying a mistrial. This argument is foreclosed by Boykin and Manthei, which hold that where disclosure of exculpatory evidence is delayed, but the evidence is nonetheless disclosed during trial, Brady is not violated. See Boykin, 986 F.2d at 276 n.6; Manthei, 979 F.2d at 127.

## B. Jencks Act

The Jencks Act requires the government to produce any statements made by a government witness that are in the government's possession and relate to the subject matter of the witness's testimony after the witness has testified on direct appeal. See 18 U.S.C. § 3500(b); Fed. R. Crim. P. 26.2. A witness's statements include all statements written or signed, or

---

[3]Nevertheless, appellants argue that the nondisclosure had a serious effect at trial: if Bauer's earlier statements had been known, then counsel for appellants would have avoided this issue on cross-examination. However, Brady was not intended as a constitutional cure-all for errors in criminal trials. While Brady helps ensure that defendants receive a fair trial by requiring prosecutors to disclose material exculpatory evidence, it does not purport to ensure a fair trial in toto. While situations similar to the one presented here may implicate other constitutional provisions, such as the Fifth Amendment's due process guarantees generally, and perhaps the Sixth Amendment's right to confrontation, Brady is not implicated.

otherwise adopted or approved by the witness; verbatim transcriptions of the witness's oral statements; and the witness's grand jury testimony. See 18 U.S.C. § 3500(e); Fed. R. Crim. P. 26.2.

Juan, Jose, and Lopez contend that the government's failure to disclose Bauer's prior oral declarations violated the Jencks Act. We disagree. When Bauer earlier implicated the defendants, he did so orally. He did not "adopt or approve" the declaration, nor was the declaration transcribed. Because oral, untranscribed, nonadopted assertions are not "statements" within the meaning of the Jencks Act, see 18 U.S.C. § 3500(e); United States v. Taylor, 599 F.2d 832, 839 n.2 (8th Cir. 1979), the nondisclosure of the Bauer declaration did not violate the Jencks Act.[4]

Jose further contends that the delayed disclosure of the Zasada file violates the Jencks Act. Jose's brief fails, however, to go beyond this cursory and summary assertion. There is no specific assignment of error; indeed, there is no discussion whatsoever of why the delayed disclosure violated the Jencks Act. Rule 28(a)(6) of the Federal Rules of Appellate Procedure requires an appellant's brief to "contain the contentions of the appellant on the issues presented, and the reasons therefor, with citations to the authorities, statutes, and parts of the record relied on." Fed. R. App. P. 28(a)(6). Failure to abide by this provision on an

_____

[4]Although not clearly enunciated, appellants appear to contend that, because the district court ordered the government to turn over all statements made by Bauer, both oral and written, all such statements are therefore converted into Jencks statements. We disagree. The Jencks Act is quite specific as to its scope of coverage. If a document falls outside that scope, Jencks is not applicable, even where the district court has nonetheless ordered disclosure. In such a situation, defendants will need to rely on other protections, such as those afforded to defendants who can demonstrate that they were prejudiced by the government's failure to comply with a court discovery order. However, defendants in this case did not avail themselves of such remedies.

issue is deemed to be an abandonment of that issue.  See <u>Jasperson v. Purolator Courier Corp.</u>, 765 F.2d 736, 740 (8th Cir. 1985); <u>see also Primary Care Inv., Seven, Inc. v. PHP Healthcare Corp.</u>, 986 F.2d 1208, 1212 (8th Cir. 1993).  Therefore, we do not consider this argument.

## III.  MONEY LAUNDERING CONVICTIONS

### A.  Western Union Documents

Gonzales and Lopez contend that the MTAs were hearsay and should not have been admitted into evidence.  The district court's decision to admit evidence is reviewed only for abuse of discretion, and "absent a clear and prejudicial abuse of discretion, the district court's ruling will be affirmed."  <u>United States v. Johnson</u>, 28 F.3d 1487, 1498 (8th Cir. 1994), <u>cert. denied</u>, 115 S. Ct. 768 (1995).

Under Rule 801(d)(2), certain statements are considered to be admissions by the party-opponent and thus do not constitute hearsay.  <u>See</u> Fed. R. Evid. 801(d)(2).  Such statements include admissions made by the party herself and those made by a coconspirator of a party during the course and in furtherance of the conspiracy.  <u>See</u> <u>id.</u>

The MTAs can be broken down into two categories: (1) the MTAs for which the government presented handwriting evidence[5] identifying the sender, and (2) all the other MTAs.  The first category of MTAs presents a straightforward admission by the party-opponent.  Because the government established an adequate foundation, <u>see</u> Fed. R. Evid. 901(b)(1)-(3), upon which the jury

---

[5]Gonzales and Lopez challenge the admission of the handwriting evidence.  Having reviewed their claims, we conclude that the district court did not abuse its discretion in admitting this evidence.  <u>See</u> <u>Johnson</u>, 28 F.3d at 1487 (standard of review).

-12-

could find that the documents were sent by one of the named defendants in this case, see id., the portion of the MTAs filled out by the defendants constitutes an admission by a party-opponent, and is not hearsay.

Although the government could not positively identify the senders of the MTAs in the second category, we conclude that these MTAs constitute admissions by party-opponents, because they were statements made by coconspirators.[6] To take advantage of this provision, the government must show, by a preponderance of the evidence, that a conspiracy existed, that the defendants and the declarant were members of the conspiracy, and that the declaration was made during the course and in furtherance of the conspiracy. See United States v. Helmel, 769 F.2d 1306, 1312 (8th Cir. 1985).[7] The government submitted voluminous evidence tying all of these documents, even those sent by unidentified declarants, to the conspiracy, see Mem. in Opp'n to Defs.' Motion to Exclude Western Union Money Transfer "Send" Documents, reprinted in Appellee's Addendum, Ex. B, and thus the district court did not abuse its

_____

[6]Although identifiability of the declarant would be helpful, it is not required. Where "the statement itself and the surrounding circumstances provide sufficient evidence of reliability, unidentifiability will not be particularly important." United States v. Cruz, 910 F.2d 1072, 1081 n.10 (3d Cir. 1990), cert. denied, 498 U.S. 1039 (1991). The burden is on the government to prove that "the unknown declarant was more likely than not a coconspirator." United States v. Helmel, 769 F.2d 1306, 1313 (8th Cir. 1985).

[7]Because the district court did not make an explicit finding that a conspiracy existed, the clearly erroneous standard of review is not applicable and the appellate court must decide whether the record supports a finding of conspiracy. See Cruz, 910 F.2d at 1081 n.11. We note that the district court's failure to make an explicit finding on this issue is not reversible error, because "the necessary threshold finding [that a conspiracy existed] is implicit in the court's decision to send the case to the jury." Id. Therefore, if the record contains sufficient evidence of a conspiracy (i.e., a preponderance), an appellate court can infer that the district court found that a conspiracy existed. See id.

discretion in admitting these documents.

## B.   Jury Instructions

Lopez and Gonzales further contend that the district court erred when it charged the jury on willful blindness and by failing to charge the jury on the defendants' theory of defense.[8]  To support both claims, the defendants assert that although they knew that they were sending money via Western Union, they did not know that the Western Union transactions were conducted to promote criminal activity.

A willful blindness instruction "is appropriate when the defendant asserts a lack of guilty knowledge, but the evidence supports an inference of deliberate ignorance." United States v. Duncan, 29 F.3d 448, 450 (8th Cir. 1994) (internal quotations omitted).  In reviewing the district court's decision to give a willful blindness instruction, "we must review the evidence and any reasonable inference from that evidence in the light most favorable to the government." Id. (internal quotations omitted).  The district court's decision to give a willful blindness instruction is reviewed only for clear error.  See id.

In this case, the government offered sufficient evidence to warrant a willful blindness instruction.  First, neither Lopez nor

---

[8]The relevant part of the instruction proposed by defendants states:

> Marta (sic) Gonzales acknowledges sending several money orders, she denied that she had knowledge that funds she sent represented proceeds of drug dealing.  She also maintains that she did not agree to send the money orders, to conceal or disguise that nature, source, or ownership of the money, and that she never made any agreement to wire money to promote the drug dealing.

XIII Trial Tr. at 99.

-14-

Gonzales took any steps to learn the source of the money sent, even though the sums sent far exceeded the legitimate incomes of them and their husbands. More importantly, both defendants were connected to transactions in which they did not use their correct names or addresses on the documents when wiring money. The district court did not err in giving this instruction.

The defendants' challenge to the district court's refusal to give a particularly-worded "theory of defense" instruction is reviewed only for abuse of discretion. See United States v. Lynch, 58 F.3d 389, 391 (8th Cir. 1995). A defendant is entitled to a theory of defense instruction only if the instruction contains a correct statement of the law and the evidence supports the instruction. See United States v. Meyer, 808 F.2d 1304, 1306-07 (8th Cir. 1987). In this case, the instruction requested by the defendants, see supra note 8, is not supported by the evidence at trial. The district court did not err in refusing to give this instruction.

## C. Sufficiency of Evidence

Gonzales and Lopez contend that there was insufficient evidence to convict them of conspiracy to launder money. In reviewing the sufficiency of the evidence to support a guilty verdict, "we look at the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict." United States v. Barrett, 74 F.3d 167, 168 (8th Cir. 1996). We then uphold the verdict if it is supported by substantial evidence. See id.

There was overwhelming evidence in this case to support the guilty verdict. The MTAs demonstrated that defendants transferred large sums of money via Western Union. A handwriting expert connected the defendants to a number of these transactions. Further, the government offered expert testimony both that the

-15-

transactions at issue fit several money laundering patterns, including the use of fake names and addresses, and that the sums transferred far exceeded the lawful incomes of the defendants and their husbands.  This is ample evidence to support the convictions.

## IV.  CONCLUSION

We conclude that the government did not violate <u>Brady</u> or the <u>Jencks</u> Act in this case.  Further, the district court did not err in the evidentiary rulings challenged on appeal, and there was sufficient evidence to convict the defendants of money laundering. The other issues raised on appeal, that the district court erred in calculating the amount of heroin attributable to Juan and that the testimony of the informants should not have been admitted, are without merit.  Accordingly, we affirm the decision of the district court.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.